IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

VONDA COFFMAN,

        Plaintiff,                Civil No. 04-6156-HA

     v.                            OPINION
                                     AND ORDER
JO ANNE B. BARNHART,
Commissioner of Social Security
Administration,

        Defendant.

---

Alan Stuart Graf
Kimberly K. Tucker
Alan Stuart Graf, P.C.
1020 S.W. Taylor St., Suite 230
Portland, Oregon 97205
      Attorneys for Plaintiff

1 - OPINION AND ORDER

Karin J. Immergut
United States Attorney
Neil J. Evans
Assistant United States Attorney
1000 S.W. Third Avenue
Portland, Oregon 97204

David R. Johnson
Social Security Administration
701 Fifth Avenue, Suite 2900
Seattle, Washington 98104
      Attorneys for Defendant

HAGGERTY, Chief Judge:

Plaintiff brings this action pursuant to § 205(g) of the Social Security Act (the Act), as amended, 42 U.S.C. §1383(c)(3), seeking judicial review of a final decision of the Commissioner of the Social Security Administration denying her application for supplemental security income (SSI).

For the reasons provided below, the court concludes that the Commissioner's decision is supported by substantial evidence. The Commissioner's decision is affirmed.

## ADMINISTRATIVE HISTORY

Plaintiff protectively filed an application for SSI benefits on February 5, 2001. She alleged disability beginning on November 1, 1991. The claim was denied initially and upon reconsideration. Plaintiff filed a previous application in 1993 that was denied on initial consideration and not further pursued by plaintiff. The administrative law judge (ALJ) hearing the pending application declined to reopen the previous application period and, accordingly, limited the time frame for review to February 5, 2001, and thereafter. However, the ALJ did consider the time period prior to February 2001 for the limited purpose of

determining credibility and the nature and extent of plaintiff's current impairments. Plaintiff made no objection.

On January 26, 2004, the ALJ issued a decision finding plaintiff not disabled within the meaning of the Act. Plaintiff requested review from the Appeals Council, which was denied. The Appeals Council's denial of review made the ALJ's decision the Commissioner's final decision. *See* 20 C.F.R. §§ 416.1481, 422.210.

**RELEVANT FACTUAL BACKGROUND**

In November 1990, plaintiff was diagnosed with Graves' disease and hyperthyroidism. In November 1994, plaintiff presented to Dr. Robert K. Levy, M.D. She reported that she had a history of Graves' disease, that she had spent the last two years bedridden, but that she had learned to adjust and was improving. She stated that her physical abilities were limited, she could not push her own grocery cart, and that she slept often. She complained of weakness and fatigue. Dr. Levy noted that plaintiff was status post-radioactive iodine therapy and appeared to have asthma.

Plaintiff reported to Dr. Levy in March 1995 that she was doing well and that she felt better than she had in a very long time. On July 25, 1995, plaintiff saw Dr. Levy for a follow-up appointment and reported that she was doing well and not having any real problems.

In February 1996, Dr. Levy assessed plaintiff with anxiety, hypothyroidism, and multiple allergies. A physical was performed on March 11, 1996. Dr. Levy noted that plaintiff was doing fairly well, although she appeared nervous and depressed. Plaintiff did

not complain of weakness or fatigue. Dr. Levy assessed plaintiff with allergies, mild asthma, anxiety, depression, and Graves' disease.

Plaintiff saw Dr. Levy in October 1999 for a follow-up visit. She reported that she was doing fairly well. In May 2000, plaintiff again reported to Dr. Levy that she was doing well; Dr. Levy scheduled a physical examination and prescribed Levothyroid for plaintiff's hypothyroidism. In September 2000, plaintiff completed a physical examination with Dr. Levy, which was mostly unremarkable, with no reports of weakness, fatigue, or difficulty sleeping.

On April 6, 2001, acupuncturist Stephen K. Procunier (Procunier) wrote a letter to the Oregon Department of Human Services in response to its request for records concerning plaintiff beginning in February 1998. Procunier wrote that plaintiff had been a regular patient since March 1997. He noted that when she first came to see him, she had severe jaw pain and uncontrollable drooling that prevented her from speaking for any length of time. He noted, however, that as of plaintiff's most recent visits, her jaw pain had improved. He also noted that plaintiff appeared extremely weak and debilitated and that she was constantly having allergic reactions. He opined that plaintiff would be unfit to work even part time, but clarified that his opinion was based on what he observed in 1998, the last time he treated plaintiff.

Plaintiff presented to Dr. Raymond P. Nolan, M.D., an internist, on April 16, 2001. Dr. Nolan's chart notes reveal plaintiff's medical history as including Graves' disease, asthma, and allergies. He noted that plaintiff complained of activity one day, followed by a full day

of rest, complained of muscle pain, and achy hands and feet. He opined that plaintiff's complaints were consistent with an assessment of fibromyalgia.

In a letter dated April 30, 2001, Dr. Robert M. Richards, a chiropractor, wrote that plaintiff told him that during a three-year period following radioactive iodine therapy she was completely bedridden and did not leave her home. Dr. Richards indicated that he began treating plaintiff in November 2000 at which time she complained of violent muscle spasms, neck and back pain, and jaw problems that allowed her to talk on a limited basis. He noted that plaintiff reported that she is only able to leave her home twice per week for a couple hours at a time, can stay on her feet for ten to fifteen minutes before she has to sit, cannot grocery shop, cook, or lift wet clothes from the washer. The only outside function she participates in is church, which she attends twice per month. Dr. Richards opined that plaintiff was extremely de-conditioned, with poor muscle strength, and limited range of motion. Her level of physical function was sub-sedentary, and she remained significantly limited in her abilities to sit, stand, walk, lift, carry, speak, sustain concentration, and socially interact.

In a subsequent letter written April 15, 2003, Dr. Richards wrote that plaintiff continued to have all of the classic signs and symptoms of post-therapeutic hypothyroidism. He noted that although plaintiff still complained of jaw, neck, shoulder, and back pain, her muscle spasms were presently more episodic and not as severe. He opined that plaintiff remained partially functional on an every-other-day basis.

Plaintiff was examined by Dr. Gary L. Gregor, Ph.D., a psychologist, on October 1, 2003. Plaintiff reported that she was managing her pain and that if she was very active one day, she would rest the following day. She was not taking pain medication. Her localized pain in the neck and jaw was somewhat ameliorated by chiropractic treatment. Plaintiff described her daily activities on a good day as watching television, going out with friends for a couple of hours, napping, working on crafts, light housekeeping, walking, and attending church twice per month. On bad days, plaintiff would write, draw, and work on crafts, but did not talk on the phone or visit with friends. Dr. Gregor diagnosed plaintiff with adjustment disorder with chronic depression and anxiety, fibromyalgia, chronic pain, and hyperthyroidism.

<u>Plaintiff's Testimony</u>

Plaintiff was forty-four years old at the time of the hearing. She completed the eleventh grade and five years of college course work but never obtained a certificate or degree. Her prior work history includes employment as a caregiver and freelance writer. She suffers from pain in her jaw and neck and muscle spasms. She has days she describes as "good" and "bad." She has a good day every other day. On these days, she can walk three blocks, cook, and clean. On bad days, she is unable to eat anything that requires her to chew because her jaw locks up. If she spends significant amounts of time talking one day, she rests the following day. She had been on this routine for approximately six years.

At the hearing, the following dialogue took place between plaintiff and her attorney:

> PLAINTIFF: My kids needed to have a mom there part of the time so I started my good day/bad day routine so they would understand

> that on my best day I could deal with anything they had to deal with
> and on my bad day they would have to just wait.
>
> ***
>
> ATTORNEY: Well, isn't it a self-fulfilling prophecy a little bit
> if you say that you're going to be good one day and then you're going
> to be bad the next day? What about having it in your mind that you
> could be good the next day and then seeing if you could have a bad
> day after that I guess and try to string the good days together more?
> Is that something that occurred to you?
>
> PLAINTIFF: Yes. Yes.
>
> ATTORNEY: So because – did you talk to any doctors about how if
> you maybe think that you're going to have a bad day than that's actually
> what you'll experience?
>
> PLAINTIFF: Yes.
>
> ATTORNEY: And so what was that discussion and what was –
>
> PLAINTIFF: Occasionally on my bad day I'll wake up and go hey,
> I don't feel so bad. But because I had the routine I leave it at the routine
> so that my children will still know that they can still come to me at my
> good days. If I didn't do that then they'd never know when they could
> approach me and when not to.

AR 290-91.

### Dr. Goodman's Testimony

Medical expert Dr. Jay M. Goodman testified that Dr. Richard's assessment of thyroid disease was profoundly different that Dr. Goodman's own training in the nature of the disease. He testified that although it was clear plaintiff suffered from Graves' disease and developed an overactive thyroid, she was currently on adequate thyroid to make her "normal." AR 310-11. According to Dr. Levy's notes, plaintiff's thyroid was well within

normal ranges by 1991. Plaintiff's asthma was aggravated by the medicines she was taking for her thyroid. Dr. Goodman opined that plaintiff was extremely de-conditioned in that she did not get any exercise, which contributed to her inability to walk long distances. Dr. Goodman also opined that plaintiff suffered from tempero-mandibular joint disease (TMJ), which was the cause of her jaw pain, but was unable to find a listing in the regulations identifying TMJ as a disability. Additionally, Dr. Goodman noted that there were conflicting medical diagnoses whether plaintiff suffered from fibromyalgia. He opined that plaintiff had the ability to perform, at minimum, light activities. Her thyroid problems posed no work-related restrictions, and because of her asthma, it would be best if she avoided dusty environments.

### Lay Witness Statements

Several letters were submitted by plaintiff's family and friends. They describe plaintiff's physical condition as being weak; she is often in pain and is tired; she speaks only every other day; her daily activities are limited; she is often confined to her home; and she alternates between "good days" and "bad days."

## STANDARDS

A claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). A person can be disabled for these purposes only if his or her impairment is "of such severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

The initial burden of proof rests upon the claimant to establish his or her disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). The Commissioner bears the burden of developing the record. 20 C.F.R. §§ 404.1512(d), 416.912(d); *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991). The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for disability benefits. 20 C.F.R. §§ 404.1520, 416.920; *Quang Van Han v. Bowen,* 882 F.2d 1453, 1456 (9th Cir. 1988). If a determination that the claimant is, or is not, disabled can be made at any step, further review is unnecessary. 20 C.F.R. § 404.1520. Below is a summary of the five steps:

<u>Step One</u>. The Commissioner determines whether the claimant is engaged in substantial gainful activity. If so, the claimant is not disabled. If the claimant is not working in a substantially gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two. 20 C.F.R. § 416.920(a)-(b).

<u>Step Two</u>. The Commissioner determines whether the claimant has a severe mental or physical impairment. If not, the claimant is not disabled. If the claimant has a severe impairment, the Commissioner proceeds to evaluate the claimant's case under Step Three. 20 C.F.R. § 416.920(c).

<u>Step Three</u>. Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the regulations. 20 C.F.R. pt.404, subpt.P, app. 1. If so, the

claimant is disabled. If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 416.920(d).

Step Four. The Commissioner determines whether the claimant is able to perform work he or she has done in the past. This requires the ALJ to examine the claimant's residual functional capacity and the physical and mental demands of the claimant's past relevant work. *Lewis v. Barnhart*, 281 F.3d 1081, 1083 (9th Cir. 2002). If the claimant is able to perform the work, the claimant is not disabled. If the claimant demonstrates, however, that he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds to Step Five. 20 C.F.R. § 416.920(e).

Step Five. The Commissioner determines whether the claimant is able to do any other work. If not, the claimant is disabled. If the Commissioner finds the claimant is able to do other work, the Commissioner must show a significant number of jobs in the national economy exist that the claimant can do. The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines. 20 C.F.R. pt.404, subpt.P, app.2. If the Commissioner demonstrates a significant number of jobs exist in the national economy that claimant can do, the claimant is not disabled. If the Commissioner does not meet this burden, the claimant is disabled. 20 C.F.R. § 416.920(f).

The burden of proof is on the claimant as to Steps One through Four. *Tackett*, 180 F.3d 1094, 1098 (9th Cir. 1999) (DIB); *see also Ball v. Massanari*, 254 F.3d 817, 821 (9th

Cir. 2001) (holding that the burden of proof is on the claimant to show that drug abuse or alcoholism is not a contributing factor material to the determination of disability). At step five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir. 1996).

The district court must affirm the Commissioner's decision if it is based on proper legal standards, and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Tackett,* 180 F.3d at 1098, *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews*, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F.3d at 1039-40. The Commissioner, not the reviewing court, must resolve conflicts in the evidence, and the Commissioner's decision must be upheld even if the evidence would support either outcome. *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1998).

## **DISCUSSION**

At Step One, the ALJ found that plaintiff had not performed any substantial gainful activity since her alleged onset date of February 5, 2001. At Step Two, the ALJ found that plaintiff had a combination of impairments considered to be severe, including

fibromyalgia, Graves' disease with hypothyroidism, and mild asthma. However, at Step Three, the ALJ determined that these impairments were not severe enough to meet or equal, either singly or in combination, one of the listed impairments. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Specifically, the ALJ found that plaintiff's hypothyroidism and asthma were regarded as not severe based on Dr. Goodman's testimony. The ALJ next determined that plaintiff had the residual functioning capacity to perform light work that avoids dusty environments. At Step Four, the ALJ found that plaintiff had no past relevant work. At Step Five, the ALJ found that plaintiff could perform work that existed in significant numbers in the national economy, and therefore, was not disabled within the meaning of the Act.

Plaintiff does not appear to dispute the ALJ's findings at Steps One, Three, or Four. Rather, plaintiff argues that the ALJ erred at the Step Two determination in his consideration of the medical and lay witness evidence, and that he erred at Step Five in his application of the vocational guidelines. Plaintiff further asserts that the ALJ erred by finding plaintiff not entirely credible. The court addresses these arguments in turn.

Medical Evidence

### Plaintiff's Impairments

The ALJ found that plaintiff has impairments that are considered severe within the meaning of the Act, but not severe enough to meet or equal, either singly or in combination, one of the listed impairments. Specifically, the ALJ found that plaintiff

suffered from Graves' disease and possibly fibromyalgia. He noted that plaintiff is hypothyroid and has asthma, but that these are considered to be non-severe. Plaintiff argues that the ALJ erred in not finding her hypothyroidism and alleged TMJ to be severe.

A "severe" impairment is defined as one "which significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ." 20 C.F.R. § 416.920(c). For the reasons provided below, the ALJ found Dr. Richards' medical notes regarding plaintiff's hypothyroidism to be less than credible when compared with other objective medical evidence, including Dr. Goodman's testimony, that showed that plaintiff's hypothyroidism did not significantly limit her abilities to do basic work activities. Accordingly, it was not error for the ALJ to find this condition not sufficiently severe within the meaning of the Act. With respect to plaintiff's alleged TMJ, the record is sparse. Nonetheless, the ALJ accepted plaintiff's claim that she had TMJ and that it caused her limitations on prolonged speaking and considered it in his analysis of plaintiff's impairments. Moreover, even if plaintiff's TMJ was to be considered severe, it is not listed as a qualifying impairment under the Act, and therefore, would not affect the ALJ's outcome.

Dr. Richards' Testimony

Dr. Richards is a chiropractor and is not considered an "acceptable medical source" under the Act. *See* 20 C.F.R. § 416.913(d) (acceptable medical sources are limited to licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists). As such, his testimony is considered the same as a lay witness. Lay testimony regarding a claimant's symptoms is

competent evidence that the ALJ must take into consideration, unless reasons germane to that witness are provided. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) (citations omitted). One such reason is when the lay testimony conflicts with medical evidence. *Id.* (citation omitted). "[M]edical diagnoses are beyond the competence of lay witnesses and therefore do not constitute competent evidence." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (citing 20 C.F.R. § 404.1513(a)).

Here, the ALJ accepted Dr. Richards' observation that plaintiff was severely de-conditioned. He did not accept Dr. Richards' subsequent opinions amounting to medical diagnoses that plaintiff suffered from disabling hypothyroidism or that her condition prevents her from being able to re-build her muscles. As additional reasons for rejecting Dr. Richards' opinions, the ALJ pointed to the inconsistencies between Dr. Richards' assessment and Dr. Goodman's opinion. Dr. Goodman, an acceptable medical source, opined that plaintiff's hypothyroidism no longer remains an issue according to the entirety of the medical evidence and the chart notes from Dr. Levy, plaintiff's treating physician. Thus, the ALJ properly considered, and rejected, Dr. Richards' assessments insofar as they exceeded the scope of his expertise and conflicted with other more persuasive medical authority.

Dr. Goodman and Conflict of Interest

Dr. Goodman treated plaintiff approximately twelve years prior to the hearing, and nine years prior to her application for benefits. Plaintiff argues that combined with this fact, his testimony at the hearing amounted to a conflict of interest. *See* 20 C.F.R. §

414.919q (where a physician who does review work for the agency has prior knowledge of a case, such as when the claimant was a patient, the physician will not participate in review or determination of a case). There exist recognized exceptions to this rule. A claimant may appropriately waive any possible conflict of interest if doing so is to the claimant's advantage. *Bergstad v. Comm'r of Soc. Sec. Admin.*, 967 F. Supp. 1195, 1205 (D. Or. 1997) (citing 56 Fed. Reg. 36932, 36947 (Aug. 1, 1991)). For example, when there is no other physician with the prerequisite expertise reasonably available, waiver may be beneficial to the client. In addition, waiver may be appropriate when denial of the waiver would cause inordinate scheduling delays or extensive travel by the claimant. *Id.*

Dr. Goodman testified that he had no independent recollection of treating plaintiff. Upon review of the record, he realized that he had written a discharge note for Dr. Bradley, and explained that his involvement in plaintiff's treatment was limited to writing the discharge note. Thus, his testimony presented a possible conflict of interest. At the hearing, the following colloquy occurred between Dr. Goodman, the ALJ, and plaintiff's counsel:

> ALJ: Let me just ask then Dr. Goodman, do you think that this would have any impact on your testimony one way or the other?
>
> DR. GOODMAN: I don't think so.
>
> ALJ: What do you think [plaintiff's counsel]?
>
> PLAINTIFF'S COUNSEL: Well, I think he was probably [sic] had some examining role even if it was minimal. . . .I don't really think that it's beneficial of the Claimant to object. It is a little bit unusual. But I respect that the opinion in the file is from chiropractor and that the weight of that is limited under the law and so Dr. Goodman's here.

15 - OPINION AND ORDER

> I don't know that we have any objection to proceeding. It's really kind of hard for her to be here now and so if she had to come back it would be hard too.
>
> ALJ: Well, I don't think it's the best practice. The only reason I would consider going ahead with it today is that it's – we're in a remote location, it's very difficult to get a medical expert to appear at a hearing in this location and from what I can see in the record and from what Dr. Goodman has testified to it looks like his contact was I guess you call it diminimus [sic].
>
> ***
>
> PLAINTIFF'S COUNSEL: Claimant elects to proceed.

AR 275-77.

"Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it." *Bergstad*, 967 F. Supp. at 1205 (citing *CBS v. Merrick*, 716 F.2d 1292, 1295 (9th Cir. 1983)). Plaintiff's counsel testified that he had received notice of Dr. Goodman's prior involvement a week prior to the hearing. Therefore, there is no indication that either he or plaintiff was surprised by Dr. Goodman's appearance. Dr. Goodman disclosed his role in plaintiff's treatment. Thus, there is no indication that plaintiff was unaware of the extent of Dr. Goodman's involvement. Accordingly, plaintiff knowingly and intentionally waived any potential conflict of interest. She pointed to the difficulties in obtaining another medical expert and the burden rescheduling would cause her.

//

Lay Witness Statements

Plaintiff argues that the ALJ's short paragraph discussing the various letters submitted by plaintiff's family and friends falls short of the requirement to provide germane reasons for rejecting lay witness statements. Although the ALJ did not recite individual reasons for rejecting each of the eight submissions, the court finds the ALJ did present "arguably germane reasons" for dismissing the statements insofar as they conflicted with accepted medical evidence or otherwise corroborated plaintiff's testimony which the ALJ found less than credible. *Lewis*, 236 F.3d at 512 (although the ALJ did not clearly link his reasons for discounting the lay witness testimony, substantial evidence supported the ALJ's decision to reject the testimony).

Vocational Guidelines

Plaintiff next argues that the ALJ erred by relying on the Medical-Vocational guidelines in finding plaintiff not disabled. Specifically, she argues that the ALJ failed to incorporate other non-specified, non-exertional impairments into the residual functioning capacity determination.

If an ALJ determines that a claimant is unable to perform any past relevant work, the ALJ proceeds to Step Five of the sequential evaluation and the burden shifts to the ALJ to produce evidence that other work exists in significant numbers in the national economy that the claimant is able to perform. This burden can be met by referring to the guidelines. *See* 20 C.F.R. pt. 404, subpt. P, app. 2, Rules 202.17, 202.18, 202.20; *Tackett*, 180 F.3d at 1099. Finding other work that the claimant can perform is aided by reference to the claimant's residual functioning capacity. *Id.* Here, the only non-exertional limitation

supported by substantial evidence in the record is that plaintiff must avoid terribly dusty environments. This did not so limit the available work that plaintiff can perform to make reliance on the guidelines inappropriate. *See* SSR 85-15 (recognizing that a claimant's inability to work in excessively dusty environments does not so impact the occupational base as to make the guidelines inapplicable).

Plaintiff's Testimony

After a claimant has produced objective medical evidence of an underlying impairment and there is no evidence of malingering, the ALJ may not reject the claimant's testimony absent clear and convincing reasons. *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004). The ALJ "must be sufficiently specific to allow a reviewing court to conclude the [ALJ] rejected [the] claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." *Id.* (citing *Rollins v. Massanari*, 261 F.3d 853, 856-57 (9th Cir. 2001) (alteration in original). The ALJ is responsible for resolving issues of credibility, reconciling conflicts in testimony, and assessing ambiguities. *Lewis*, 236 F.3d at 509 (citation omitted). If "the ALJ has made specific findings justifying a decision to disbelieve an allegation . . . and those findings are supported by substantial evidence in the record, [the court's] role is not to second-guess that decision." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)) (alterations in original and added).

Here, the ALJ noted that on April 30, 2001, plaintiff told Dr. Richards that she had been completely bedridden for three years after her iodine therapy in late 1991 or early

1992. Yet, on November 15, 1994, plaintiff told Dr. Levy that she had been bedridden for only two years. In addition to this apparent inconsistency, the ALJ found that plaintiff's claimed limitations did not arise from any medically determinable impairments, but rather stemmed from her chosen pattern of behavior. Plaintiff testified that she maintained her "good day, bad day" routine in large part for the benefit of her children, and that it had become a practice to which she, and they, had become accustomed. The ALJ also pointed to Dr. Goodman's testimony that plaintiff's thyroid is within normal ranges and that her thyroid condition "is no longer and has not been an issue" since 1994. AR 17-18, 311. Dr. Goodman testified that plaintiff demonstrated an ability to perform, at minimum, light activities and perhaps more, which directly contradicted plaintiff's claims. Recognizing that it is the ALJ's duty to determine credibility, resolve conflicts in the evidence, and assess ambiguities, the court finds that the ALJ provided sufficient reasons for the court to conclude that the ALJ did not arbitrarily discredit plaintiff's testimony.

//

//

//

//

//

**CONCLUSION**

Based on the foregoing, the findings of the Commissioner are based on the correct legal standards and are supported by substantial evidence. The final decision of the Commissioner denying plaintiff's application for SSI benefits is AFFIRMED.

IT IS SO ORDERED.

DATED this ___29__ day of July, 2005.

___/s/Ancer L.Haggerty_____
Ancer L. Haggerty
United States District Judge